Martha Mitchell Bates, Appellee, v. The People of the State of Illinois ex rel. Oscar Nelson and A. W. Frankenfeld, Receiver, Appellant.

Gen. No. 8,563.

2

Heard in this court at the October term, 1931. Opinion filed February 1, 1932.

E. E. DOWELL, for appellant.

HILL & BULLINGTON, for appellee.

MR. JUSTICE ELDREDGE delivered the opinion of the court.

On February 6, 1930, the auditor of public accounts closed for examination and audit H. N. Schuyler State Bank located at Pana, Christian county, Illinois and on April 21, 1930, A. W. Frankenfeld, appellant herein, was appointed receiver of the bank by the auditor which appointment was confirmed by the circuit court of Christian county upon a bill filed by the auditor for that purpose.

This appeal is from a decree entered by the circuit court on the intervening petition of Martha Mitchell Bates, appellee, praying that a certain claim held by her against said insolvent bank be adjudged to be preferred and ordered paid in full over the general creditors of the bank. Upon a hearing before the court on the intervening petition the chancellor entered a decree adjudging among other things said claim to be preferred. To review this decree this appeal is prosecuted by the receiver.

It appears that appellee resided at Oconee, Montgomery county, Illinois, and in 1914, received as her distributive share through some estate located at Medina, New York, a promissory note for the principal sum of $4,500 and a mortgage securing the same on some property in that State. For many years she had transacted all her banking business with the H. N. Schuyler State Bank of Pana of which Mr. H. N. Schuyler was president, but the evidence does not show that she had any general account with said bank at the time the transactions involved in this case took place. When she received this note and mortgage she placed it for safe-keeping in the Schuyler Bank and apparently collected the interest thereon each year. The note became due in the spring of 1929 and she requested the bank through Mr. Schuyler to collect it for her. The Schuyler Bank collected the note and interest amounting in all to $4,725 by way of a draft on some other bank payable to the Schuyler Bank. As soon as the Schuyler Bank received this draft it sent it to the Chemical National Bank of New York to be deposited to the credit of the Schuyler Bank, said Chemical National Bank being the New York correspondent of the Schuyler Bank. After the collection was made by the Schuyler Bank, a certificate of deposit (Exhibit B) was executed by said bank as follows:

"CERTIFICATE OF DEPOSIT.

Established January 1, 1876.

Incorporated January 1, 1906                      70–348
No. 145737.

H. N. SCHUYLER
STATE BANK.

Capital $200,000

$4725.00
Pana, Ill., Apr. 3, 1929.

Martha Mitchell Bates has deposited in this Bank Forty Seven Hundred Twenty-Five and no-100 Dollars,

payable to the order of self on return of this Certificate, properly indorsed.

H. N. Schuyler,

President.

This deposit is not subject to check.''

This certificate of deposit was not delivered to appellee until after the receiver was appointed. Immediately after the collection of the note was made by the Schuyler Bank it notified appellee by letter of that fact and she was requested to call at the bank, and several days after appellee received the letter she went to the Schuyler Bank at Pana and had a conversation with Mr. Schuyler in regard to her money. Part of her testimony is as follows:

"Q. The question is what did you say to Mr. Schuyler and what did Mr. Schuyler say to you with reference to this money that you got from the east? . . .

A. He told me he would put it out on a farm mortgage, and I left the money at the bank. . . .

Q. Go ahead and tell what he said.

A. Well he told me that he would notify me as soon as he got the papers ready; he was busy that morning, he would mail them to me, but he did not.

Q. Then did you go back?

A. I sure did.

Q. What did he say and what did you say?

A. He said he had been busy and had not got the papers ready, but he would get them ready right away.

Q. What did you say to him?

A. I went home like I always did and left the money there. . . .

Q. What did you say if anything to him on the day this paper was issued to you? Tell what you said to him and what he said to you.

A. I said I never got anything to show that the money is here, I would like to have something to show that I have got the money here. He told Miss Seiler to write me out a receipt.

Q. Where did that take place?

A. Right in the bank where Miss Seiler sat at her desk. . . .

Q. Did you go in there (Schuyler Bank) at the same time that that draft came?

A. No sir, he notified me that the money was there, for me to come in; *I told him I wanted him to loan it out, told him I would give him the privilege to put it out* . . .

Q. Do you remember the date on which you had your first conversation with Mr. Schuyler?

A. I do not — . . . I don't remember them, no I don't.

Q. When was the first time that you ever talked to Mr. Schuyler about this matter?

A. Well he had advised me to transfer it here, on account I could look after it better. It was a mortgage back there, and it come due then I transferred it here, or had him to transfer it. . . .

Q. Question read.

A. You mean about loaning it out?

Q. No, about the money, you said you had in the Schuyler Bank? . . .

A. It come from the bank in New York to Mr. Schuyler's bank, I never had the money myself.

Q. When was the first time after that, that you talked to Mr. Schuyler?

A. I cannot tell you, it was in 1929, when it come due. It come to the bank and he notified me the money had come, I called up, I cannot tell you the date.

Q. Can you tell about the time?

A. Sometime in April. The first of April was when it was to be paid.

Q. And at that time did you have any conversation with Mr. Schuyler?

A. *After the money come I told him he could put it out. He said he would put it out for me, I told him he could;* you want me to tell you the next thing?

Q. You have answered my question.

A. I did.

Q. *You told him he could loan this on a mortgage?*

A. *Yes, on a farm mortgage.*

Q. He told you he would?

A. Yes.

Q. He told you he would do that when he could find a suitable loan for you, didn't he?

A. No sir, he was to put it out right away.

Q. He said he would put it out right away?

A. Yes sir, he did.

Q. Was that all that occurred at that time?

A. Yes sir, I left the money there and I went home.

Q. Then when was the next time you saw Mr. Schuyler?

A. Next time I went to town, I could not tell you how long it was.

Q. Do you remember what month it was in?

A. No, I don't it was likely in April.

Q. Did you go into the bank again?

A. I did, and I didn't get that receipt.

Q. Who did you talk to when you was in the bank that time?

A. Mr. Schuyler and Miss Seiler both of them.

Q. When was the next time you were in there after this last time?

A. I think that is when I get the receipt, I am not sure. I think the second time I went and I asked for the receipt and I told them I had nothing to show that I had anything there.

Q. Then it was that time you obtained this paper, which has been marked for identification as Exhibit 'A,' that is the receipt?

A. Yes sir.

Q. Who was present at the time you got this receipt?

A. Mr. Schuyler and Miss Seiler. He told her to write that out.

Q. What did he say, to give you a receipt for the money?

A. Yes, he told her to give me a receipt or whatever he called it, she wrote it out. . . .

Q. When was the next time you went in to see Mr. Schuyler about this matter?

A. I could not tell you, I went in different times, he was always busy, but the last time he said he had it partly fixed out, he had been working on it."

The so-called receipt referred to in the above testimony is as follows:

"H. N. SCHUYLER STATE BANK.

$4725.00          Pana, Illinois, April 27, 29, 19. . . .

Received from Mrs. Martha Mitchell Bates, Forty Seven Hundred Twenty-five and no-100 Dollars.

To be invested in Mortgage Loan.

H. N. Schuyler State Bank.

N. S."

The above receipt (Exhibit A) is the basis for the contention of appellee that the Schuyler Bank held the money collected for her as trustee for the purpose of loaning the same for her.

Miss Seiler, stenographer and bookkeeper of the Schuyler Bank and a witness for appellee testified in substance: "After Exhibit B (the certificate of deposit) was issued and until the bank was closed, for a good part of the time it was in my letter basket on my desk. When the bank closed Exhibit B was in a basket marked unfinished business, in a till that was kept for that purpose. It was issued because that was the way we carried any collection that was temporary in the bank and not yet disposed of. With reference to this particular deposit Mr. Schuyler asked me to go through the mortgage file and see if we had anything that would fit the amount of money either in one mortgage or two or more if necessary. He told me he had promised Mrs. Bates to have a mortgage

covering that if we had anything to fit it, and if we did not we would give her the first that came in that would fit it. We had on other occasions done similar transactions for people.''

While the original note and mortgage remained in the Schuyler Bank for safe-keeping, appellee owned the same and the relations between her and the Schuyler Bank were that of bailor and bailee. When the bank collected the note and mortgage for appellee at her request and received the money therefor the relations between the parties became that of debtor and creditor. In the case of *People v. Iuka State Bank,* 229 Ill. App. 4, it was held: ''It seems to be the recognized doctrine of the courts of this State, and also other courts, that where paper has been sent to a bank with instructions simply to collect, the collection of the fund establishes the relation of debtor and creditor between the parties, and in that case there would be no trust. The greater weight of the authorities seems to be, however, that when the paper so sent is accepted for collection under expressed terms to collect and remit, then the money when collected is in the hands of the bank, a trust fund. (*Macy v. Roedenbeck, supra; National Life Ins. Co. v. Mather,* 118 Ill. App. 491; *People v. Auburn State Bank,* 215 Ill. App. 133.)''

There was no request by appellee in the case at bar to have the money remitted to her. The question then arises whether the future transactions between the parties changed the status between them of debtor and creditor to that of trustee and *cestui que trust.* After appellee received the receipt above mentioned no further conferences or dealings were had between her and the bank until after the receiver was appointed April 21, 1930, except that she inquired several times if the loan had been made. When the receiver took possession of the bank he discovered the certificate of deposit and mailed it to appellee. Miss Seiler testified that the certificate of deposit had not been delivered to ap-

pellee before for the reason that it was kept on her desk as unfinished business on account of the bank attempting to procure a loan for the money for appellee. After the money had been collected by the bank and before the subject of loaning it was taken up between appellee and the bank, it had been deposited to the credit of the Schuyler Bank in the Chemical National Bank of New York. The evidence shows that the daily balances of the Schuyler Bank in the Chemical National Bank during the period from the time appellee's money was collected by the Schuyler Bank until it was closed by the auditor, varied from $1,500 to $10,000. The evidence does not disclose what the balance was, if any, the day the Schuyler Bank was closed. When Exhibit A was executed the money had already become mingled with the other moneys of the Schuyler Bank and used by it in the business transactions of the bank and this was before it is claimed that the trust was established, and before Exhibit A was executed.

In the case of *People v. Farmers State & Savings Bank,* 338 Ill. 134, one Hamman, a township school treasurer, deposited school moneys in the Farmers State Bank in the savings department thereof and the bank issued a pass book to him as "Treasurer." The bank failed and a receiver was appointed. Hamman filed an intervening petition to have said school moneys declared a trust fund and for a preference or priority in payment over other creditors of the bank. The court held: "As to whether or not the account was a trust fund under the facts of this case depends primarily upon the kind of deposits made by plaintiff in error. There are but two kinds of deposits: special and general. The former include those where the bank becomes a trustee for a depositor by special agreement or under circumstances sufficient to create a trust, and general deposits are those where the bank merely becomes the debtor of the depositor. As a rule, when money is deposited in a bank, title to such money

passes to the bank. The bank becomes the debtor of the depositor to the extent of the deposit, and to that extent the depositor becomes the creditor of the bank. Such deposit then constitutes a part of the assets of the bank, and in case of insolvency of the bank that deposit belongs to the creditors of the bank in proportion to the amount of their respective claims. Well recognized exceptions to this rule are, first, where money or other thing is deposited with the understanding that that particular money or thing is to be returned to the depositor; second, where the money or thing deposited is to be used for a specifically designated purpose; and third, where the deposit itself was wrongful or unlawful. In the instant case the deposits made by plaintiff in error were known to be composed of school funds, but there was no request or direction on the part of the township treasurer to the bank that it should keep the funds separate from other money in the bank. The funds were placed in a savings account, and the fact that the bank agreed to, and did, pay interest upon the account tends to show the bank's privilege of using the money without restriction. The record discloses no agreement whatever between the bank and plaintiff in error as to keeping the funds intact or their use and application for any particular purpose. The mere fact that a depositor makes a deposit in a fiduciary rather than an individual capacity does not make the deposit a special one.''

In the case at bar there was no request by appellee that her money should be kept separate from the other money in the bank. When appellee requested the bank to collect the note and mortgage held by her said request was not coupled with any other directions of any kind whatever. When the bank made the collection and received the draft for the money collected, it credited appellee with the amount of the draft and issued a certificate of deposit therefor in her name and immediately sent the draft to the Chemical National Bank

of New York where it was deposited to the credit of the Schuyler Bank and became immediately mingled and mixed with the other moneys and deposits of the latter bank and used by it in and about its business as such bank. The identity of the fund as a fund thereby became lost before appellee made any request of the bank to invest her money in a mortgage loan. Her deposit in the bank at the time her request was made of the bank to procure for her a mortgage loan was a general deposit and she occupied no other position than that of a general creditor of the bank. When the bank through its president told appellee that he would invest her money for her as soon as he could find a loan to fit the amount of her deposit, the general deposit of appellee was not thereby changed from a general to a special one for the purpose of making a mortgage loan nor was the bank thereby created a trustee for the specific purpose of making the loan, especially insofar as the other general creditors of the bank were concerned. Nor, in our opinion, did the receipt given by the bank have such an effect. The receipt itself under the circumstances was but a promise on the part of the bank to procure a mortgage loan for appellee for the amount of her deposit when one could be found, and appellee's acceptance of the receipt was an authorization of the bank to use her funds for the purchase of such loan. A number of cases have been cited by counsel for appellee in support of their contention that a trust was established but the decision in each case rests upon the facts that the original deposit was a special one for a specific purpose and that the fund had not lost its identity as such but could be traced and determined. *Woodhouse v. Crandall,* 197 Ill. 104; *People v. Iuka State Bank,* 229 Ill. App. 4; *People v. Auburn State Bank,* 215 Ill. App. 133; *Kirby v. Wilson,* 98 Ill. 240.

In the case of *Wetherell v. O'Brien,* 140 Ill. 146, one Roberts conducted a bank in Chicago known as the

Thirty-first Street Bank. Michael Gerrity, as executor of the estate of John O'Brien, deceased, and Ellen O'Brien, the widow of the deceased, went to said bank and deposited $1,900. Gerrity told Roberts that Mrs. O'Brien wanted him to loan the money out as soon as he could upon a good real estate mortgage; that she wanted to leave it with him until it could be so loaned; that he should take care of it until he could find a place to lend it. Roberts took the money and delivered to Mrs. O'Brien a certificate of deposit for the amount, which was entered and posted in the savings department of the bank. The court held:

"Under the facts as thus stated the appellee is not entitled to be paid in full in preference to the other creditors, but must share with them in the assigned estate. There was, here, no case of bailment or special deposit. When the identical thing delivered is to be restored, though in an altered form, the contract is one of bailment, but when the obligation is to return other things of the like kind and equal in value, it becomes a debt. (*Lonergan v. Stewart,* 55 Ill. 44.) The parties did not contemplate, that the same identical money received by Roberts, or his bank, was to be kept for the appellee, and returned to her. Nor was the money delivered to Roberts, or the bank, as a special deposit. The deposit was a general one. . . .

"When money, which is delivered to a bank, even though it be for some specified purpose, as, for instance, investment in a mortgage security, has been mingled with the funds of the bank, as was done here, there is no reason why the depositor should be preferred above any other creditor."

In the case of *Mutual Accident Ass'n v. Jacobs,* 141 Ill. 261, the association deposited with Samuel A. Kean, doing a banking business under the name of S. A. Kean & Co., the sum of $6,000 to be held by Kean to indemnify himself and one Cummings from any liability that might be incurred by them, or either of

them, by reason of their having signed an appeal bond, as sureties for said association. The character of the deposit was acknowledged by S. A. Kean & Co. by a written instrument as follows:

"This is to certify that the Mutual Accident Association of the Northwest has deposited with Samuel A. Kean, of the county of Cook, State of Illinois, the sum of $6000, to be held by the said Kean upon the following conditions: Whereas, one Emma A. Tuggle, of the county of McDonough, recovered a judgment against the said Accident Company for the sum of $5000 and costs, from which the said Accident Company have taken an appeal to the Appellate Court; and whereas, the said Samuel A. Kean and Jesse H. Cummings have signed the appeal bond in the said case: now, therefore, this $6000 deposited with Samuel A. Kean is to be held by the said Kean to indemnify himself and the said Jesse H. Cummings from any loss or liability incurred by them, or either of them, by reason of having signed said appeal bond, and after the said Jesse H. Cummings and Samuel A. Kean are fully discharged from all liability under said bond, then the said $6000 is to be returned to the said Mutual Accident Association, but not otherwise.

S. A. Kean & Co. (Branch),

Wesley L. Knox, Manager."

The evidence showed that the association gave S. A. Kean & Co. a check on another bank, which went through the clearing house and was paid, and S. A. Kean & Co. with the knowledge of the petitioner mingled the money with the general funds of the Bank in the same manner as money deposited by other depositors. S. A. Kean & Co. made an assignment for the benefit of their creditors and the association filed an intervening petition seeking to have the deposit declared a special deposit in trust. The court held: "Here the money passed into the bank as a general deposit. It was mingled with other funds deposited

in the bank, so that there is no means of separating it from other moneys received by the bank in its usual course of business, and the petitioner occupies the position of a general creditor."

In the case of *Bayor v. American Trust & Savings Bank,* 157 Ill. 62, it was held: "It has frequently been announced as the law of this State, that even in a case where a definite and actual trust fund, which possesses all the attributes of a separate and distinct identity, has been so mixed and mingled with other funds as to render identification impossible, the *cestui que trust,* in the event of the insolvency of the trustee, is remitted to the position and the rights of a general creditor; and where the relation between the parties is primarily that of debtor and creditor, and there is a mere unperformed agreement on the part of the debtor to create a specific fund which shall possess a separate identity, and to hold the same in trust, it would be illogical and inconsistent with these adjudications to hold that such creditor occupies a stronger position than one who is primarily the beneficiary of a distinct and identified trust fund. We regard the cases of *Trustees of Schools v. Kirwin,* 25 Ill. 73, *Otis v. Gross,* 96 id. 612, *Union Nat. Bank of Chicago v. Goetz,* 138 id. 127, *Wetherell v. O'Brien,* 140 id. 146, and *Mutual Accident Ass'n v. Jacobs,* 141 id. 261, as conclusive against the contentions urged herein by appellant."

Appellee had at all times before the bank closed complete power and control over her money. She could have at any time before that date withdrawn the fund *in toto,* or rescinded her request of the bank to purchase for her a mortgage loan, or could have requested the purchase of some other security. The purchase of the mortgage loan was never consummated and appellee allowed her money to remain in the bank for a period of 10 months and during that period of time the relation of debtor and creditor was never changed.

The decree is erroneous in other respects in that it orders the receiver to pay to appellee the sum of $4,725 out of the moneys now on hand or to be collected from the assets of said bank within 90 days. Even if it be considered that the receiver held said fund as a trust fund and that appellee had a preference or priority in the payment thereof over the general creditors of the bank, yet she could only share pro rata with the other preferred creditors, if any. There is no evidence as to whether at the time the decree was entered there were any other preferred creditors or whether the liquidation of the bank had proceeded far enough to determine whether there might be other preferred creditors. It was error also to order the receiver to pay her claim within 90 days as there was no evidence that the administration of the affairs of the bank had reached such a point that an order of distribution to the creditors would be expedient or even possible within that time and there was no evidence that after the costs of the administration had been paid there would remain in the hands of the receiver sufficient funds to pay the claim. Upon the finding that the claim of appellee was a preferred one, the decree should have provided that upon the distribution of preferred claims, appellee should share pro rata with the other preferred creditors.

The decree of the circuit court is reversed and the cause is remanded with directions to enter a decree finding that appellee is a general creditor of the bank and that her claim should pro rate with the claims of all the other general creditors thereof.

*Reversed and remanded with directions.*